CHICAGO AND NORTHWESTERN RAILWAY
*v.* McLAUGHLIN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF IOWA.

Argued November 29, 30, 1886. — Decided December 20, 1886.

Defendant in error was in the employ of plaintiff in error as a car repairer. While mounted at a side track upon a ladder which rested against a car that he was repairing by order of his immediate superior, he was thrown from the ladder by reason of the car being struck by a switching engine and car, and was seriously injured. He brought a suit against the Railway Company under § 1307, Code of Iowa of 1873. The Railway Company defended upon the grounds: (1) that there was no negligence on the part of its employés which entailed responsibility on the company; (2) that there was contributory negligence on the part of the plaintiff

below. The case was tried before a jury, and resulted in a verdict of $15,000 for plaintiff below, and judgment was entered on the verdict. This court, on the case made by the record in error, affirms that judgment by a divided court.

It was enacted in § 1307 of the Code of Iowa of 1873 that:

"Every corporation operating a railway shall be liable for all damages sustained by any person, including employés of such corporation, in consequence of the neglect of agents, or by any mismanagement of the engineers or other employés of the corporation, and in consequence of the wilful wrongs, whether of commission or omission of such agents, engineers, or other employés, when such wrongs are in any manner connected with the use and operation of any railway on or about which they shall be employed, and no contract which restricts such liability shall be legal or binding."

In March, 1878, the testator of the defendant in error commenced this suit against plaintiff in error in the Circuit Court of Clinton County, Iowa. The petition set forth as follows:

"The plaintiff complains of the defendant, The Chicago and Northwestern Railroad Company, a corporation organized and existing under the laws of the State of Illinois, and doing business in the State of Iowa, being engaged in operating a railroad in said last named State, moving by steam power cars containing passengers and goods over the said railroad; that the plaintiff, on the 18th of October, 1877, in the city of Clinton, State of Iowa, was in the employment of defendant as a car repairer of defendant's said cars, and whilst at said date and in said city plaintiff was engaged in the performance of his duty repairing one of defendant's cars which was standing on one of defendant's side tracks, the plaintiff standing at a height of about nine feet from the ground on a ladder which was inclined against said car, the plaintiff was then and there, through the carelessness, negligence, and default of said defendant and its servants thrown violently to the ground, breaking the right leg of plaintiff and inflicting upon him other great and permanent injuries, to the damage of plaintiff in the sum of fifteen thousand dollars. The plaintiff therefore demands judgment against the said defendant for the sum of fifteen thousand dollars, with interest and costs."

On the petition of defendant the action was removed into the Circuit Court of the United States; and in that court the plaintiff filed the following amendment to his petition:

"Now comes plaintiff and, by leave of court first had, amends his original petition and amendment thereto, heretofore filed herein as follows, viz.:

"1. He states that while properly and not negligently performing the service stated in said original petition, his position became suddenly dangerous by reason of the shifting of certain switches and running an engine and car upon the track where he was working.

"That the switchman performing said service of shifting said switches saw plaintiff in his position, which became dangerous by said acts, and although plaintiff was thereby placed in imminent peril thereby, and said switchman could easily have prevented a collision and injury to plaintiff by the exercise of ordinary care and caution, in either apprising plaintiff of the sudden approach of said engine or by turning the brake upon said car, or causing the engineer in charge of said engine to stop the same, he failed so to do, but carelessly, negligently, and heedlessly allowed said collision and injury to take place to plaintiff's great injury.

"2. That the fireman upon said engine saw plaintiff in said exposed position, and, after the danger and peril of plaintiff's life and limbs were well known to him, he allowed said collision to take place, although he could, by the exercise of ordinary care, have prevented it by notifying the engineer that plaintiff was in danger, but that he carelessly, negligently, and with a total disregard for plaintiff's safety, neglected and failed to impart said notice, and plaintiff was injured thereby.

"3. That the engineer in charge of said engine thrown in and upon said track as aforesaid, by reason of plaintiff's perilous position, was ordered to stop his said engine, and that he could easily have obeyed said instruction, but disregarding said order to stop and carelessly and heedlessly refusing to inquire into the cause of such order, but with a negligent and total disregard of consequences, hurried said engine on to a collision, as stated in plaintiff's original petition.

" 4. That the facts rendering plaintiff's position perilous by reason of the movements of said switches and car and engine were to plaintiff entirely unknown, although due care and caution was exercised by him.

" Wherefore plaintiff prays judgment as heretofore."

To this amended petition defendant made the following answer:

" For answer to plaintiff's petition herein as amended, defendant states — ' I. It denies each and every allegation in said petition and amendment contained. II. The plaintiff was guilty of negligence, which contributed to the injury complained of in this: He failed to notice or listen for the approach of engines or other cars, and failed to get down from the ladder whereon he stood when the engine and car which caused the injury approached the line of cars whereon plaintiff was at work, in plain sight of plaintiff, with the bell ringing to warn all persons of their coming.' "

The cause was tried before a jury with verdict for plaintiff in the sum of $15,000, and judgment was entered on the verdict. Defendant sued out this writ of error. The defendant in error died after the cause was docketed here, and his executor appeared and defended the suit.

The exceptions brought up all the evidence. It was in some respects conflicting. Counsel for plaintiff in error filed with their brief a statement of the facts which they regarded as established. Counsel for defendants in error referring to this statement, filed with their brief a statement of " omitted and material facts in the interest of defendant in error." From the two statements the following facts appear to be substantially agreed to by both parties:

Clinton, Iowa, is a division station on the railway of plaintiff in error. All freight trains coming from east or west are here stopped and retrained. The tracks of the main line and sidings run east and west.

Near the west end of the yard, and about nine feet north of the main line, is a track some fifteen hundred feet long, known as " number two track," used exclusively for way-cars. Just north of this way-car track is another side track, known

as "track number three." There is a cut-off track from the main line, by which tracks numbers two and three are reached through switches.

Whenever a freight train comes into Clinton from the east or west, the way-car is taken off by a switch engine, and put on this track number two, and when any freight train is to go out either east or west, a switch engine goes on to track number two to get a way-car for such out-going train. All way-cars going or coming from the west are used "first in first out," while those going and coming from the east had "regular run" way-cars. A switch engine went on to number two track about twenty times during each day time, to put away or to get a way-car. Two switch engines were used in the yard in the day time, and three during the night time. There were from twenty to thirty trains each way per day, and the switch engines in the yard kept up a clatter and constant ringing of bells.

O'Neil was a coach-builder, or car carpenter, and worked for the railway company in its shops at Clinton from 1865 to 1877, except about four years, during which latter time he was away working mostly for the officers of the company. The shop where he worked was situated about eight rods from the main line, at the east end of the yard, where the volume and character of the traffic could be seen by him. In the performance of his duty he was required to work on or about the trains. For about a year before his injury he had been accustomed to go upon the way-car track number two, on an average of once a week to do repairs, such as putting in lights of glass broken out of way-car windows, fixing door locks, putting on and repairing lamp-brackets, and the like. At the time of the injury he was acting under the direct order and instruction of his immediate superior.

About 10 o'clock in the morning of a clear, pleasant day in October, 1877, O'Neil, by direction of the foreman, went to track number two, to do some repairs on way-cars, and among other things, to take off some old lamp-brackets and put on new ones. After doing some work, O'Neil put his ladder up on the south side of a way-car on number two track. There

were seven or eight way-cars on this track — two east of the one on which he was working, and the rest west of it. There was a space of a few feet between those to the west and the other three.

These way-cars were ten to twelve feet high, and the ladder about the same length. Way-cars project out over the track about two feet, and allowing for the proper slant, the foot of O'Neil's ladder rested near the ends of the ties on the north side of the main line.

The distance from the ladder where O'Neil was, to the switch on the cut-off east, was about one hundred and seventy-five feet, and to the switch where the cut-off joins the main line, about two hundred and fifty feet. There were two cars just east of the one on which O'Neil's ladder rested. All three were close together; but whether coupled or not is unknown. These switches from the main line to the cut-off and to number two track were somewhat worn, and made considerable noise when an engine passed over them.

O'Neil went up the ladder with a brace screw-driver, a hammer, and a new lamp-bracket. He was not furnished with a second man as lookout; but he could have heard the ringing of the engine bell if he had been listening. He put the new lamp-bracket on top of the car, and stepped down a step or two to take off the old bracket. This was done by taking out two screws with his brace screw-driver, and breaking off two screws with a hammer. Just before the accident, he was breaking off screws which held the lamp-bracket, with a hammer, with his face within four or five inches of the car. Just as this work was finished, which occupied about two minutes according to the best judgment of O'Neil, the car on which his ladder rested received a shock which threw him violently from his ladder, and he struck on the tie, or the iron rail of the main line, breaking his femur in two places, and inflicting very severe and permanent injuries which totally disabled him, and shortened his life. At the time of the injury he was facing westwardly, while the engine which caused the injury came from the east. Before he exposed himself, in the performance of his duty, he found, from examination of

the switches, that four switches must be turned, east of him, before a car could enter the track upon which he was working, and the employés so turning such switches could plainly see him on the ladder. He could not see the nearest switch, the turning of which threw the car and engine on to the track, causing the injury, because the lever was on the north side and obscured by standing cars.

The accident happened in this way : Switch-engineer Schumaker and Fireman Riggs came off a side track south of the main line, with the engine headed west, and with a way-car ahead of the engine. Switchmen Wilde and Ellenwood accompanied them on foot ; Wilde on the south side of the track and Ellenwood on the north side of it. The bell of the engine was ringing. Just what side track they came from none of them remember, but it was some side track which came on to the main line east of the switch which leads from the main line to the cut-off, and to number two way-car track. The object of the switchmen was to go in on way-car track number two, to get a way-car for the use of some out-going train. The situation was such that the engineer, when on the main line east of the cut-off switch could have seen O'Neil on the ladder if he had looked ; but he was watching his switches ahead of him, and did not see O'Neil at all. After his engine passed off the main line on to the cut-off, and thence on to track number two, the engineer could not have seen O'Neil if he had looked, because he was on the north side of his engine, and the way-car attached to the front of his engine wholly obstructed his view. Wilde saw O'Neil on the ladder at a distance from the point where the striking cars caused the injury ; "thought he would get down ; didn't pay much attention to it." Ellenwood could not see O'Neil on the ladder at all.

The fireman, Riggs, on the south side, a part of whose duty it was to look out for danger, saw O'Neil for a distance of from one hundred and twenty to one hundred and fifty feet before reaching the point of injury, and watched him, knowing that if he did not get down from the ladder he would be injured, and knowing, or believing, that he was working. He did not speak to the engineer of the fact, but, shortly before the collision

he shouted "Whoa!" in an unusually sharp tone which was the word he always used when he wanted the engine to stop quickly. Schumaker at once obeyed Riggs' signal which he knew meant "stop," by putting his lever in the back motion. He did not know why he was ordered to stop, but did know that it had no reference to the contemplated coupling, for he was looking out for that himself. He did not inquire why he was ordered to stop. He had already shut off steam from his engine. At this time the engine was moving four or five miles per hour, and the reversal of the lever would have stopped the engine and car before the car struck the standing cars, on one of which O'Neil was. But when the cars were six to ten feet apart, and the engine had practically come to a full stop, Switchman Ellenwood, who was on the north side of the way-car track, ready to couple the way-car attached to the engine, to the standing way-cars, seeing the cars were not going to come together so that he could make the coupling, gave a signal and called out to Schumaker to come ahead a little. Thereupon Schumaker at once put the lever in the forward motion, and instantly put it in the back motion again, because an instant of forward steam he knew was enough to send the cars together, which proved correct. The coupling was made, and the accident to O'Neil happened.

The instant Riggs heard Ellenwood give the signal to come ahead a little, he told Schumaker that there was a man on the side of the car, but the same instant Schumaker had put his lever forward and back again, the cars had struck and the injury was complete.

When the engine and car came off the main line, they were moving four to five miles per hour. They slacked up for the switch at track number two, and started up again to four or five miles per hour at the time Riggs gave the signal "Whoa." The engine and car were in plain sight of O'Neil from the time they came off the side track on the main line, until they struck the standing cars on one of which he was at work; and he admits that if he had been listening he could have heard the click of the engine coming over the switches, and could have seen the engine while on his ladder by turning his head

to the east, and could also have heard the ringing of the bell, but he did not look nor listen while on the ladder at work.

The time which elapsed from the time the engine and way-car left the main line until the accident happened was probably twelve to fifteen seconds, and from the time Riggs gave the signal "Whoa," to the time of the accident, was probably from three to five seconds.

After the evidence was in defendant asked the court to instruct the jury as follows:

"1. Conceding to all the testimony its greatest probative force, it is not sufficient to warrant the jury in finding the defendant or any of its servants guilty of any negligence whereby the plaintiff received his injuries.

"2. The undisputed and uncontradicted evidence shows that the plaintiff was guilty of negligence which directly contributed to his injury. You are therefore instructed to find for the defendant."

These requests were refused. Defendant excepted, and made the refusal one of the assignments of error in this court.

Defendant also excepted to many passages in the charge to the jury. In this court the giving of the following instructions was assigned as error:

"4. Under the statute of the State of Iowa, every corporation operating a railway is liable for all injuries caused to, and the consequent damages sustained by, the employés of such corporation in consequence of the neglect of a co-employé in the performance of his duty to the company; that is to say, the negligence of an employé in the discharge of the duties of his position in the employ of the company is deemed to be the negligence of the corporation, and will render the company liable for any injuries caused thereby to any of its other employés, unless the person injured is himself guilty also of negligence contributing to the accident."

"14. It is claimed on part of the plaintiff that the switchman on the south side saw O'Neil's danger in time sufficient to have averted the danger. On part of defendant it is claimed that this switchman did not see O'Neil in time, and under such circumstances as that it was his duty to either have

stopped the engine or warned the plaintiff of the danger. Has the plaintiff by a fair preponderance of evidence, satisfied you that this switchman had knowledge of plaintiff's danger in time sufficient to have averted the accident either by stopping the engine or through a warning to the engineer, or by notifying plaintiff of the coming danger, so that he could have avoided the accident? It is not sufficient for it now to appear that possibly the switchman might have done so if he had known all the facts that are now made apparent. The true inquiry is, was this switchman, acting under the light and knowledge he then had, wanting in the exercise of ordinary care in not stopping the engine, or in not notifying plaintiff of his danger? Did he or not have knowledge of the danger to which plaintiff was exposed in time sufficient to enable him by the use of ordinary care to have caused the engine to be stopped, or to warn the plaintiff, so that he might have gotten down from the ladder before the cars came in contact?"

"15. It is further claimed on behalf of plaintiff that the fireman, Riggs, was negligent in not notifying the engineer of the peril to which plaintiff was exposed. There is evidence tending to show that Riggs saw the plaintiff upon the ladder and knew of his position, and that there was danger of an injury being caused to him if he did not get down before the cars came in contact; that Riggs gave a signal to the engineer to stop in time to prevent the cars coming into contact, which signal the engineer obeyed by shutting off the steam and reversing the engine. On part of plaintiff it is claimed that Riggs should have notified the engineer of the necessity for stopping the engine, namely, that there was a man in a dangerous position; and it is claimed that Riggs had time sufficient to have so done, so that the engineer could have prevented the cars coming in contact. On the part of defendant it is claimed that Riggs did all that could reasonably be expected of him; that he gave the proper signal to stop the engine, and that in obedience thereto the engineer reversed his engine and brought it nearly to a stop, and then, before Riggs had time to ascertain the necessity for any further action on his part, the engineer, in obedience to a signal from the switchman,

which could not have been reasonably foreseen by Riggs, gave a forward motion to the engine, and that it was beyond the power of Riggs to again notify the engineer to stop in time to prevent the accident."

"16. It was the duty of Riggs, if he saw the plaintiff was in a dangerous position, and that there was risk of an accident if the cars were brought into contact before plaintiff should get down from the ladder, to take such action as was reasonably within his power to stop the engine and prevent the cars from coming into contact. When human life or limbs are in peril, ordinary prudence requires that all reasonable means should be used by those who are aware of the danger, to avert the same and avoid injury to the person exposed thereto. Riggs himself testifies that he saw plaintiff upon the ladder, knew that he was in a dangerous position if the cars were brought into contact, and saw, as the engine approached the standing cars, that the plaintiff remained upon the ladder. Under these circumstances, was or was it not his duty to notify the engineer, who had control of the engine, of the nature of the danger to be avoided, or was his duty discharged when he gave the signal to stop by crying out 'Whoa'? Did he or did he not have sufficient time to give such information to the engineer, if you find the same should have been given? It is for you to determine what ordinary prudence, when human life and limb were in danger, required of Riggs under the facts and circumstances known to him at that time, and whether Riggs did or did not do all that ordinary prudence required of him, and all that he had a fair opportunity to do, in the exercise of ordinary care, in the brief time in which he was required to think and act?"

"17. It is further claimed on part of plaintiff that the engineer did not exercise ordinary care and prudence on his part, in that, after receiving the signal to stop from the fireman, and after, in obedience thereto, reversing his engine and bringing the same nearly to a stop, he then, in obedience to a signal from the switchman on the north side of the track gave a forward motion to the engine and brought the cars into contact, without first ascertaining the reason why the signal

to stop was given by the fireman. On part of defendant, it is claimed that the switchman and fireman have a right to signal the engineer, and that it is the duty of the latter to obey such signals, and if the switchman gave the signal without fault on his part, there would not be negligence on part of engineer in obeying the signal thus given."

"18. That the engineer is bound to obey signals given by the switchmen is doubtless true, as a general proposition, but by this can only be meant that the engineer is bound to obey, if there is no good reason why he should not obey. Suppose he received a signal from a switchman to move forward when he sees that if he does he will cause an accident, would it not then be clearly his duty to disobey the signal? Suppose at the instant he receives a signal from the switchman to move forward his fireman notifies him that there is a man on the track in danger, and that he must stop. It cannot be doubted that in such cases the engineer must disobey the signal from the switchman. Take it in this case. Suppose the engineer knew that the plaintiff was on the ladder, exposed to danger, if the cars were brought into contact, and the switchman gave the signal to move forward, would it be acting with reasonable prudence to obey the signal, or would it not be clearly the duty of the engineer to disobey the same? But it is in evidence that the engineer in this case did not know in fact that the plaintiff was in danger. He had received a signal from his fireman, on the left of his engine, requiring him to stop, and he obeyed it by shutting off steam and reversing his engine. What inference did the engineer draw from the signal given him by the fireman to stop? Did he or did he not infer therefrom that there was some sufficient reason known to the fireman why the engine should be stopped? Was he not bound to so infer, and if he did, what was it his duty to do when he received the signal from the switchman on the other side of the track to move forward? Did or did not ordinary care and prudence require of him to ascertain from his fireman the reason of the order to stop given by the fireman on his left, before he obeyed the order to move forward given him by the switchman on his right? The engineer him-

self testifies that the signal 'whoa' given by the fireman was given somewhat sharply, indicating the necessity for promptly stopping the engine; and he further testifies that from the distance from the engine to the stationary cars he supposed the order to stop was given by the fireman, not because the cars were close enough for coupling, but for some other cause or reason unknown to him, and that he started the engine forward upon receiving the signal from the switchman without making any inquiry of the fireman whether he could safely do so, or without inquiring why the fireman had ordered him to stop the engine. In so doing, did or did not the engineer exercise the care which ordinary prudence demanded of him?"

"19. If, under the instructions given you, you find that none of the employes of the company were guilty of negligence causing the accident, then your verdict must be for defendant, and you need not consider any other of the questions submitted to you. If, however, you find that the defendant was negligent in any of the particulars alleged against it, and that such negligence was the immediate cause of the injury to plaintiff, you will then consider whether the defence of contributory negligence set up by the defendant has been made out and sustained by a fair preponderance of the evidence, the burden of the issue in this respect being upon the defendant; or, in other words, in order to defeat plaintiff's recovery on the ground of contributory negligence on his part, you must be fully satisfied from the evidence, that plaintiff was guilty of negligence which proximately contributed to the injury complained of."

"20. It was the duty of the plaintiff, when he was engaged in the work at which he was put by the defendant, to exercise ordinary care on his part to protect himself from danger. He knew when he undertook the repairs on the car in question that it stood upon a track where engines might possibly come, and he was bound to the exercise of all the care and watchfulness which an ordinarily prudent man would use under the same circumstances."

"21. Extraordinary care was not required of him. He was expected to do the work that he was sent to attend to, and

he could only be required to exercise the care and watchfulness that were compatible with the discharge of his duty to the company. Plaintiff testifies that he did not see or hear the engine when it was approaching, and it is claimed that his failure to notice its approach is proof of his negligence, on the theory that if he had kept his senses on the alert he would either have seen or heard the engine in time to have avoided the accident. On the part of plaintiff it is claimed that his failure to notice the approach of the engine was due to the fact that the work he was engaged in doing so occupied his attention that without fault upon his part, he failed to notice the coming of the engine, either by sight or sound. You will consider all the evidence introduced in the case tending to show what work the plaintiff was required to do; the position he occupied upon the side of the car, the direction in which his face was turned whilst at work upon the ladder, the character of the work upon which he was actually engaged, and the demands, if any, which this work made upon his attention, the distance from where the plaintiff was at work to the point where the engine came upon track No. 2, the number of cars, if any, between that upon which plaintiff was at work, and the approaching engine, and all facts shown by the evidence adduced by either party which tend to throw light upon the question — and from this evidence, you will determine whether the defence of contributory negligence, as alleged by the defendant, has been established by a fair preponderance of evidence, the burden of establishing the same being, as already stated, upon the defendant."

"22. If the evidence, under the instructions given you, fails to establish the fact that the plaintiff was wanting in the exercise of proper care and watchfulness whilst engaged in repairing the way-car of defendant, then the defence of contributory negligence is not made out, and on this issue, you should then find for plaintiff; but, on the other hand, if you find that the failure of plaintiff to notice the approach of the engine was due to a want of ordinary care and watchfulness on part of plaintiff, you will then consider and determine whether the defendant had knowledge of the dangerous posi-

tion of plaintiff and of his failure to notice the approach of the engine in time to have avoided the injury to plaintiff by the exercise of reasonable care on its part, the rule of law being that, although the plaintiff may have negligently exposed himself to an injury, yet if the defendant, after discovering the exposed situation and danger negligently incurred by the plaintiff, can, by the exercise of reasonable care on its part, prevent any injury to plaintiff, it is bound so to do, and a failure to exercise such reasonable care, after knowledge of the danger to which plaintiff may be exposed, will render the defendant liable for a resulting injury, notwithstanding the fact that plaintiff may have been in the first instance, negligent on his part. Under such circumstances, plaintiff's negligence is not deemed to be a proximate cause of the injury. If then, you find from the evidence that the plaintiff, through his failure to notice the approach of the engine in time to get down from his exposed situation on the side of the way-car, was guilty of negligence contributing to the causing of the injury complained of, then your verdict must be for the defendant, unless you further find that, after discovering the fact that plaintiff was at work upon the way-car in such a manner as to expose him to danger in case the cars were brought into contact, the defendant could, by the exercise of proper care, have prevented the accident, and that having knowledge of the danger to which plaintiff was exposed the defendant failed to exercise proper care, thereby causing the accident, in which case your verdict should be for the plaintiff. That is to say, if you find from the evidence that the switchman Wilde, and the fireman Riggs, or either of them, saw the plaintiff in his exposed position, and knew the danger to which he would be exposed if the cars were brought into contact whilst the plaintiff was on the ladder, then it was the duty of such switchman or fireman, as already explained to you, to take such reasonable means as were fairly within his power, to prevent bringing the cars into contact, after he knew that plaintiff had failed to notice the approach of the engine. If by the use of such means on part of those in charge of the engine, the accident could have been prevented, and you find that

Opinion of the Court.

they have failed to use such means, after having knowledge of the plaintiff's exposed position and failure to notice the approach of the engine, and that in consequence of such failure, the accident was caused, then the fact that the plaintiff failed to notice the approach of the engine, would not defeat his right of recovery."

*Mr. N. M. Hubbard* and *Mr. Charles A. Clark* for plaintiff in error.

*Mr. William A. Foster* for defendant in error.

Mr. Chief Justice Waite announced that the judgment of the court below was

*Affirmed by a divided court.*